IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **DONALD E. SMITH,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 6:09CV151 |
| | § | BENCH TRIAL |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Donald E. Smith ("Smith") brought suit against Defendants United States of America ("United States") and Edwards Transportation, LLC d/b/a Mesa Mail Services, LLC ("Edwards") alleging negligence and premises liability under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1). Smith and Edwards settled, and the United States is the only remaining defendant in this case. The matter came for trial on the merits without a jury and was taken under submission. After considering the testimony, exhibits, arguments of counsel, and supporting memoranda, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

**BACKGROUND**

Smith seeks damages for personal injuries sustained when he fell from the scissor lift at the loading dock of the Lone Oak, Texas Post Office ("Loan Oak Post Office") on September 15, 2007.

---

[1] To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

The basis of Smith's premises liability claim is that the United States Postal Service ("USPS") had a duty to provide a safe work environment to its contractors and their employees but failed to include required safety devices on USPS equipment. The basis of Smith's negligence claim is that the USPS failed to require or take steps to ensure the proper use of safety devices.

*Edwards's Duties Under the Contract*

The USPS awards transportation contracts to independent contractors based on competitive bids. Trial Tr., 107:23-24. Edwards provides mail transportation services to the USPS pursuant to Transportation Services Contract HCR 754B8, Greenville, Texas, to Golden, Texas (the "Contract"). Joint Pre-Trial Order ("JPTO"), Docket No. 50, at 5, ¶ E.1. The term of the Contract between Edwards and the USPS runs from April 1, 2007 to March 31, 2011. *Id.* at 5, ¶ E.2. Edwards is an independent contractor of the USPS and is referred to as the "supplier" or "contractor" throughout the Contract. *Id.* at 5, ¶¶ E.1 and E.3.

Under the Contract, Edwards is responsible for "load[ing], transport[ing], and unload[ing] all classes of mail at the headout, en route, and destinating offices." Contract, Pl.'s Ex. 16 at B-3. The Contract requires Edwards to be responsible for the safe loading and security of equipment. Specifically, the Contract requires that "[d]rivers responsible for loading or assisting in the loading of their vehicles must ensure that loads are properly distributed and secured and that doors, tailgates, and other equipment are fastened properly to permit safe operation." Contract, Pl.'s Ex. 16 at B-10–B-11. Edwards is also responsible for the hiring, screening, and identification of its drivers and subsequently ensuring that every driver has sufficient ability to properly perform the required duties under the Contract. JPTO, Docket No. 50, at 5, ¶¶ E.4. and E.5. Specifically, the Contract requires Edwards to identify and screen all individuals who require authority to drive or who need access to

the USPS facilities or the mail before the individuals are allowed to perform under the Contract. Contract, Pl.'s Ex. 16 at B-8–B-9. The Contract also requires that Edwards "not employ any individual who is: lacking sufficient ability to perform properly the required duties; not a reliable and trustworthy person of good moral character; [or] barred by law or Postal Service regulations from performing such duties." *Id.* at B-7.

The USPS maintains only administrative control over independent contractors such as Edwards. Trial Tr., 114:9-10. The USPS can monitor Edwards to ensure that it is performing its contractual duties, but it does not have any daily hands-on supervision or oversight of how Edwards performs its contractual duties. Trial Tr., 114:11-23. The USPS does not train any of Edwards's new hires because the Contract is a service contract and Edwards is responsible under the Contract to train its own employees. Trial Tr., 110:25–111:5. Furthermore, the USPS does not have the resources or manpower to train every new driver for every contractor whenever a new employee is hired. Trial Tr., 112:12–113:5. Edwards is responsible for training all of its new hires, Trial Tr., 110:25–111:5; 200:14–201:19; 208:13-22, and is required to show its new hires how to perform the duties that are required under the Contract, including how to perform the duties safely. Trial Tr., 110:19-22; 126:3-6. Existing Edwards drivers are responsible for training new drivers—this includes training a new hire on how to use a scissor lift. Trial Tr., 200:21–201:6.

To train a new hire on the use of a scissor lift located on postal premises, Edwards would need to use the scissor lift on postal premises. Trial Tr., 118:12-24; 201:10-12, 17-19; 209:7-9. There was no prohibition against Edwards using the scissor lift on postal premises to train its new hires. Trial Tr., 118:7-24; 201:4-6, 13-16. According to the Contract, the only equipment that the supplier is prohibited from using are USPS-owned electric pallet jacks due to USPS-specific training

and certification issues regarding the use of such equipment. Trial Tr., 115:3–116:12. Only certified postal employees are authorized to operate these electric pallet jacks. Trial Tr., 137:24–138:6; 156:16–157:10. The Contract language governing pallet jacks does not apply to scissor lifts because a scissor lift is clearly not a pallet jack and a scissor lift does not require specialized training. Trial Tr., 116:13-15; 117:21-23; 117:24–118:1. Although Edwards employees are allowed to use the scissor lift on postal premises, there are not always postal employees present at postal facilities when Edwards delivers the mail. Trial Tr., 90:20–91:10. No one is employed by the USPS to tell Edwards employees what to do on the premises or how to perform their jobs duties. Trial Tr., 88:23–89:2; 91:11-13.

*Scissor Lift*

A scissor lift is a standard piece of equipment used for the purpose of unloading deliveries by trucks at postal facilities such as the Lone Oak Post Office. Trial Tr., 116:17-21; 129:9-11; 201:7-8; 208:23–209:4. The scissor lift consists of a flat metal platform with slip-resistant grooves that can be moved up and down by the press of a button. Trial Tr., 199:5-8; 201: 7-9; 209:1-4; Def.'s Ex. 1-12, 27. The scissor lift platform can raise to the same level as the truck bed, at least three feet above the dock. Trial Tr., 28:19; 29:1; 211:20-21. When the scissor lift raises and lowers, an alarm sounds. Def.'s Ex. 27. The scissor lift has two enclosed sides and two open sides, and the equipment containing the mail can be pushed onto the lift through the open ends. Def.'s Ex. 1-12.

The platform of the scissor lift is level (i.e., not slanted) and the all purpose containers ("APCs") can remain stationary on the raised scissor lift platform even without the safety cord being attached. Def.'s Ex. 10-11. However, each open end of the lift at the Lone Oak Post Office is equipped with metal safety cords attached to poles at each end of the lift that can be attached by the

4

operator for safety and to prevent equipment or people from falling off the lift. Trial Tr., 189:22-24; 198:11-13; 198:25-199:4. The safety cord is a metal rope that can be stretched across the open end of the scissor lift platform and connected to a latch on the opposite pole. Trial Tr., 30:24–31:25; Def.'s Ex. 1–12. The safety cords were attached to the scissor lift posts on the morning of September 15, 2007. Trial Tr., 93:25–94:13.

The scissor lift also had warning stickers that instruct a person using the scissor lift to use the safety cords on the lift. Trial Tr., 198:20-24. The warning stickers are orange with black lettering which reads: "USE HANDRAIL AND CHAINS WHILE OPERATING LIFT." Trial Tr., 181:14-16; Def.'s Ex. 12. There are four of these warning stickers located on each of the four posts of the scissor lift platform. Trial Tr., 180:15–181:16. The stickers face inwards so that a person standing on the scissor lift looking towards the opposite end—such as a driver standing on the truck bed facing the end of the dock—would be able to read them. Trial Tr., 94:23–95:7; 181:17-21. The warning stickers were on the scissor lift posts on the morning of September 15, 2007 and have been on the scissor lift since at least 2000, when the Lone Oak Post Office was built. Trial Tr., 94: 20-22; 95:11-16; 96:2-8.

*Events of September 15, 2007*

On September 14, 2007, Ronald Waldroup, an Edwards employee, contacted Smith by telephone and instructed Smith to report for work the next morning. Trial Tr., 47:19, 24. Smith was instructed to meet Johnny Bushnell, also an Edwards employee, at 4:45 a.m. on Saturday, September 15, 2007 at the Valero truck stop in Greenville, Texas. JPTO, Docket No. 50, at 6, ¶ E.8. "James," an Edwards employee located at the Edwards corporate office in Lake Charles, Louisiana, contacted Johnny Bushnell with the same meeting instructions. Trial Tr., 209:23–210:1. On September 15,

2007, Bushnell met Smith at the pre-arranged location, and Smith rode with Bushnell to the Greenville, Texas Postal facility ("Greenville hub"), the first stop on the mail route. Trial Tr., 48:2. Independent contractors' employees are not permitted to enter secured postal facilities or to handle the mail unless they have been issued a badge, Trial Tr., 138:20-25, and at the Greenville hub, USPS employee Kim Earls Barnett ("Earls") told Bushnell that Smith was not authorized to be inside the postal facility or handle mail because Smith did not have the correct paperwork or a badge. JPTO, Docket No. 50, at 6, ¶ E.10; Trial Tr., 50:19; 142:9; 162:16–163:21. Earls indicated, however, that the decision to allow Smith to ride along with Bushnell without his necessary paperwork or badge was ultimately up to Edwards. Trial Tr., 166:4-6. After Bushnell reported Earls's instructions to "James" at the Edwards corporate office, "James" told Bushnell to go ahead and take Smith along and train him. Trial Tr., 211:4-13. Although Bushnell was to train Smith, Smith was not allowed to enter a postal facility or "mess with the mail." Trial Tr., 211:4-13.

After leaving the Greenville hub, Smith traveled in the Edwards truck with Bushnell along the mail route to the Lone Oak Post Office. As usual, there were no postal employees present on the Lone Oak Post Office dock when they arrived. Trial Tr., 54:14; 87:6-22; 98:15-17; 199:9-10. Bushnell used his keys to enter the secured postal facility and retrieved the mechanism required to operate the scissor lift. Trial Tr., 87:23–88:3; 211:14-16. Bushnell connected the power switch and raised the platform. Trial Tr., 211:17-21. Smith watched Bushnell raise the scissor lift platform from the dock up to the level of the truck and then Smith climbed onto the scissor lift platform. Trial Tr., 28:18-19; 211:22–212:3. As he climbed up onto the scissor lift platform, Smith thought to himself "it looks like there ought to be something back there" blocking the open ends of the scissor lift, but he climbed onto the scissor lift anyway. Trial Tr., 57:19-20; 60:7-11; 61:24–62:1. After

raising the scissor lift, Bushnell opened his truck's tailgate and began to unstrap the APCs designated for the Lone Oak stop. Trial Tr., 212:4-9. As Bushnell turned to get another APC, Smith grabbed one of the APCs and began to pull it towards him. Trial Tr., 28:21; 212:9-14. Smith pulled the loaded APC while walking backwards, felt a "bump" after grabbing the APC, lost his footing, and fell from the raised scissor lift platform three or four feet onto the ground. Trial Tr., 28:21–29:3; 212:14-16. Smith did not know whether the "bump" was caused by Bushnell hitting him or by Smith himself hitting the side rails of the scissor lift platform. Trial Tr., 71:19–72:1.

Although the warning stickers and safety cords were present on the scissor lift that day, neither Bushnell nor Smith connected the safety cords before raising the scissor lift. Trial Tr., 93:25–95:10; 218:6-10; 57:16. Bushnell testified that he never used the safety cords because he was capable of safely operating the scissor lift with two APCs by holding on to the two carts. Trial Tr., 217:24–218:10.

As a result of the accident, Smith suffered personal injuries including a broken lower vertebrae. Trial Tr., 34:5-15. Smith's outstanding medical bills total $6,558.57. Trial Tr., 39:14-20; Pl.'s Ex. 1-11. Smith's physician, Dr. Prasad, gave no orders that Smith could not return to work and released Smith to return to regular duty work on December 5, 2007. Trial Tr., 74:16-23; 75:19-21; Pl.'s Ex. 3.

*Edwards's Failure to Train Smith*

Both Waldroup and Bushnell had been trained by other Edwards drivers on how to operate the scissor lift. Trial Tr., 198:11-19; 198:25–9199:1; 208:23–209:4. Despite its duty to train its new hires, Edwards provided no training to Smith and gave him no instruction on the proper loading and unloading procedures, handling of the APCs, or the operation of the scissor lift. Trial Tr., 212:17-20;

7

212:24–213:6. Bushnell neither told Smith about the safety cords that were present and operable on the scissor lift on the date of the accident nor did he show Smith how to connect them. Trial Tr., 62:3-10; 93:25–94:13. Bushnell provided no training to Smith regarding the proper method of handling the APCs. Trial Tr., 69:2-5, 16-18; 212:17-20; 212:24–213:6. Smith was never told how to stop an APC on the scissor lift platform or whether to push or pull the APCs. Trial Tr., 71:9-18. Although Bushnell did not provide any training to Smith, he did warn Smith to be careful on the scissor lift and told Smith about how one of his friends had died as a result of injuries sustained after falling off a liftgate connected to a truck. Trial Tr., 213:19–214:5.

## NEGLIGENCE CLAIM

*Applicable Law*

As the sovereign, the United States is immune from suit unless it consents to be sued. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994); *McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993). Although the United States has consented to be sued under the FTCA,[2] the FTCA's waiver of sovereign immunity is limited by exceptions that preclude Government liability. *See* 28 U.S.C. § 2680. Courts must "strictly construe" these exceptions in favor of the Government. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994) (citing *Atorie Air, Inc. v. Fed. Aviation Admin.*, 942 F.2d 954, 958 (5th Cir. 1991)). If a claim falls within the scope of any of the exceptions, the district court lacks subject matter jurisdiction and dismissal under Federal Rule of Civil Procedure 12(b)(1)

---

[2]Under the FTCA, the United States can be liable for any:

> negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

8

is appropriate. *See Truman*, 26 F.3d at 594.

Under the FTCA, there is no subject matter jurisdiction over claims "based upon the exercise or performance or the failure to exercise or perform a *discretionary function* or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (emphasis added). This exception to the FTCA's waiver of sovereign immunity is referred to as the "discretionary function exception." *See, e.g., Buchanan v. United States*, 915 F.2d 969, 970 (5th Cir. 1990). In deciding whether the discretionary function exception applies, courts apply a two-part analysis. *United States v. Gaubert*, 499 U.S. 315, 319–22 (1991). First, the Government's conduct must involve discretionary acts that involve an element of judgment or choice and not involve mandatory compliance with a particular federal statute or regulation. *See id*. at 322. Second, the conduct must have been a policy judgment of the type the discretionary function exception intended to shield. *See id*. at 319–20. That is, the exception "protects only governmental actions and decisions based on considerations of public policy." *Id*. at 323. "Supervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function." *Guile v. United States*, 422 F.3d 221, 230 (5th Cir. 2005).

*Analysis*

The United States has contended from the outset of this case that the USPS delegated the responsibility for safety to Edwards and that this delegation is a valid exercise of discretion under the FTCA. The United States argues the Court should apply the discretionary function exception to preserve the United States' sovereign immunity for claims regarding its failure to ensure the proper use of safety devices. Smith argues that the discretionary function exception does not apply because the USPS did not delegate to Edwards any responsibility for the scissor lift or its safe operation and

9

the Contract is completely silent on the issue of unloading and the use of the scissor lift to unload mail.

Although the USPS did not explicitly delegate the responsibility for all safety to Edwards under the Contract itself, the record is robust with evidence showing that the USPS did delegate to Edwards the responsibility for safety in performing its duties under the Contract. Under the Contract, Edwards is responsible for the hiring, screening, and the identification of its contract employees, as well ensuring that every driver has sufficient ability to properly perform the required duties under the Contract. JPTO, Docket No. 50, at 5, ¶¶ E.4 and E.5. Edwards is also responsible for the safe loading and security of equipment, and for training all of its new hires. Contract, Pl.'s Ex. 16, at B-10–B-11; Trial Tr., 110:25–111:5; 200:14-201:19; 208:13-22. Thus, to comply with the Contract, it was Edwards's responsibility to train its employees to perform their duties under the Contract safely, which includes the use of all available safety devices. Accordingly, the USPS delegated to Edwards the responsibility for safety in performing its duties under the Contract.

The USPS's delegation of this responsibility to Edwards satisfies the two-part *Gaubert* analysis. First, the USPS's decisions regarding safety are discretionary acts because they are not regulated. Smith does not cite to any statute or regulation that requires the USPS to supervise its contractors and their employees or ensure their compliance with safety requirements. Thus, it appears to be undisputed that the USPS's delegation of the responsibility for safety is a discretionary act that involves an element of judgment or choice. Indeed, "[w]here no statute or regulation controls the [G]overnment's monitoring of a contractor's work, the extent of monitoring required or actually accomplished is necessarily a question of judgment, or discretion for the [G]overnment." *Kirchmann v. United States*, 8 F.3d 1273, 1276 (8th Cir. 1993).

Second, the decision to delegate responsibility for safety was a policy judgment, grounded in economic and other policy considerations. The USPS has an annual transportation budget of six billion dollars and has approximately 17,000 highway contracts with independent contractors nationwide to transport mail from one facility to another and at designated stops in between. Trial Tr., 105:4-15. The record shows that independent contractors can provide delivery services cheaper than the USPS can using its own employees. Trial Tr., 119:18-20. The USPS does not have the resources or manpower to train every new driver for every contractor whenever a new hire is brought on. Trial Tr., 112:12–113:5. It would burden the USPS's limited personnel and financial resources to train and supervise every new hire of its independent contractors when it retains no control over who is hired to perform the contractual duties of the independent contractor. Thus, it is incumbent on the USPS to rely on an independent contractor to train its own employees because the USPS has only finite resources available to accomplish its mission. Based on the United States' undisputed public policy considerations, it appears the USPS's policy judgment to delegate the responsibility for safety to its contractors is the type of act the discretionary function exception intended to shield.

The USPS delegated to Edwards the responsibility for safety in performing the duties under the Contract, i.e., safely loading and unloading mail. This delegation was an exercise of a valid discretionary function and thus, it was incumbent upon Edwards to make sure its employees performed their duties under the Contract safely. Accordingly, the Court applies the discretionary function exception of the FTCA to preserve the United States' sovereign immunity as it relates to Smith's negligence claims for failure to require or take any steps to ensure the proper use of safety devices. Because the United States has not waived its sovereign immunity, the Court lacks subject matter jurisdiction over Smith's negligence claim against the United States for the USPS's failure

to require or take any steps to ensure the proper use of safety devices. Therefore, the Court dismisses Smith's negligence claim.

## PREMISES LIABILITY

*Applicable Law*

The duty owed by a premises liability defendant to a person injured on the premises depends on the legal status of the injured party—that is, whether the plaintiff was an invitee, a licensee, or a trespasser. *W. Invs. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). A "trespasser" is a person who enter the premises without lawful right or the consent of the possessor, but merely for the trespasser's own purposes or out of curiosity. *Tex.-La. Power Co. v. Webster*, 91 S.W.2d 302, 306 (Tex. App.—Houston [14th Dist.] 2009, no pet.). An "invitee" is a person who enters the possessor's premises in response to an express or implied invitation by the possessor and for the benefit of both parties. *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex. 1975). Smith was an invitee at the time of the incident because he entered the USPS's premises as an Edwards employee to perform under the Contract.[3]

As an invitee, to prevail on his claim of premises liability in regards to his injuries allegedly caused by some condition on the premises of the Lone Oak Post Office, Smith must show: (1) Smith was an invitee; (2) the USPS was a possessor of the premises; (3) the condition posed an unreasonable risk of harm; (4) the USPS knew of the dangerous condition; (5) the USPS breached its duty of ordinary care by both failing to adequately warn the plaintiff of the condition and failing

---

[3] Although the parties originally disputed whether Smith was a trespasser or an invitee, the United States now agrees that Smith was an invitee at the time of the incident. United States' Proposed Findings of Fact and Conclusions of Law, Docket No. 73-1, at 21–22, ¶ 18. Although Smith was specifically prohibited from touching the mail and entering secured areas of postal facilities, the USPS left supervision of Smith up to Edwards. Edwards was responsible for training its new hires and made the decision to allow Smith to ride along with Bushnell for training. Thus, the Court agrees that Smith was an invitee at the time of the incident.

to make the condition reasonable safe; and (6) the USPS's breach caused the injuries in question. *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992); *Vanderbeek v. San Jacinto Methodist Hosp.*, 246 S.W.3d 346, 352 (Tex. App.—Houston [14 Dist.] 2008, no pet.). To determine whether a condition is "dangerous," the analysis focuses on whether a reasonably prudent person would foresee that harm was a likely result of the condition. *Rosas*, 518 S.W.2d at 537. With respect to independent contractors and their employees, constructive knowledge of a dangerous condition is insufficient proof of the premises owner's knowledge. *Phillips v. Dow Chem. Co.*, 186 S.W.3d 121, 132-33 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Furthermore, where the invitee was an employee of the premises owner's independent contractor, the premises owner's duties to its independent contract and the contractor's employees are limited. A premises owner is liable to its independent contractor's employees "only for claims arising from a pre-existing defect rather than from the contractor's work, and then only if the pre-existing defect was concealed." *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 215 (Tex. 2008). Thus, a premises owner has a duty to inspect the premises and warn the independent contractor of any concealed dangerous condition that the owner knows or should know exists. *Id*. It is the independent contractor who has a non-delegable duty to provide its own employees "a safe place to work, safe equipment to work with, and [to] warn them of potential hazards." *Id*. In addition, the independent contractor "controls the details and methods of its own work, including the labor and equipment employed." *Id*. Accordingly, a premises owner "expects the contractor to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warnings." *Id.* at 215–216; *see also Cunningham v. United States*, 827 F. Supp. 415, 417 (W.D. Tex. 1993).

*Analysis*

In order to prevail on his premises liability claim, Smith must prove the existence of a dangerous condition that posed an unreasonable risk of harm and that the USPS had actual knowledge of this dangerous condition. Smith's premises liability claim fails as a matter of law because there is no evidence of any dangerous condition on the premises of the Lone Oak Post Office that posed an unreasonable risk of harm.

First, the scissor lift itself is not a dangerous condition on the USPS premises. USPS employee Ewin Cook and Edwards employees Waldroup and Bushnell all testified that the scissor lift was a simple piece of equipment. Trial Tr., 116:13-21 (Cook); 201:4-9 (Waldroup); 208:23-25–209:1-9 (Bushnell). The scissor lift contained warning stickers and safety cords at both ends which were present before the accident occurred and present and operable on the scissor lift on the date of the accident. Trial Tr., 94:20-22; 95:11-16; 96:2-8. Waldroup knew of the warning stickers on the scissor lift and utilized the safety cords in accordance with the warning stickers' instructions. Trial Tr., 198:11-21. Furthermore, evidence shows that the APCs remain stationary on the flat platform of the scissor lift even without the safety cords attached because the scissor list platform is level. Def.'s Ex. 10-11. Bushnell used the scissor lift countless times without ever employing the safety cords and without ever falling off. Trial Tr., 217:24–218:10. Smith presented no evidence that the scissor lift was actually a dangerous condition.

Second, Edwards's employees' use of the lift without any instruction or training does not amount to a dangerous condition on the USPS premises. Edwards was expected "to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warnings." *Gen. Elec. Co.*, 257

S.W.3d at 215–216. Thus, it was Edwards's responsibility to take all proper precautions to assure the safety of its employees in performing their contractual duties. *See Cunningham*, 827 F. Supp. at 417.

Furthermore, it is clear from the record that the required use of the safety cords when operating the scissor lift was open and obvious. Smith testified that when he saw the scissor lift raising and did not notice the safety cords that were present, he thought to himself "there ought to be something there." Trial Tr., 57:19-20. Smith had experience working on raised platforms and knew that safety was important. Trial Tr., 63:23–64:5; 67:17-24. In addition, warning bells sounded as the scissor lift raised up from the dock platform, clearly advising Smith that the lift was raising off of the ground. Def. Ex. 27. Finally, Smith presented no evidence that the warnings or safety devices that were present on the scissor lift at the Lone Oak Post Office were inadequate. The scissor lift had adequate warning stickers relating to the safety cords: they were orange with black lettering that read: "USE HANDRAIL AND CHAINS WHILE OPERATING LIFT." Trial Tr., 181:14-16; Def. Ex. 12. Waldroup testified that the warning stickers on the scissor lift served as reminders to use the safety cords when using the scissor lift. Trial Tr., 198:20-24. Smith presented no evidence of what alternative warning stickers could have or should have been used on the scissor lift or what reasonable steps the USPS could have or should have taken to eliminate or warn of the purported dangerous condition.

Smith has not shown that there was a dangerous condition on the premises of the Lone Oak Post Office. No reasonably prudent person would foresee that harm was a likely result from a properly functioning scissor lift that was equipped with warning stickers, safety cords, and buzzers. Because Smith has not shown that there was a dangerous condition on the premises of the Lone Oak

Post Office, the United States is not liable to Smith for premises liability.

## CONCLUSION

For the reasons stated above, Smith's negligence and premises liability claims fail as a matter of law. Accordingly, the Court finds for the United States and **HOLDS** that Smith take nothing.

**So ORDERED and SIGNED this 13th day of July, 2010.**

**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**